SAHLGAARD *v.* KENNEDY and others.

STRICKER *v.* SAME.

MESSCHAERT *v.* SAME.

*(Circuit Court, D. Minnesota.   July 15, 1882.)*

1. EQUITY—PARTIES—JOINT INTERESTS.
   While it may be that the holder of negotiable securities can at law maintain a suit in his own name, excluding equities under given circumstances, yet when joint parties seek to upset judicial decrees, charge trusts, and fasten supposed liens in consequence of joint interests, all of them should be before the court, that it may be known to what extent and in whose favor a decree may be had.

2. SAME—INTERFERENCE WITH DECREES OF OTHER COURTS.
   Courts should judiciously refrain from interfering with the decrees of other courts, except when such interference or inpeachment is plainly necessary.

The First Division of the St. Paul & Pacific Railroad Company, owning a line of railroad from St. Paul via St. Anthony to Watab, a distance of about 80 miles, known as its Branch Line, and a line of railroad from St. Anthony to Breckinridge, a distance of 207 miles, known as its Main Line, to each of which lines was attached a land grant consisting originally of 6 sections per mile, and subsequently increased to 10 sections, made the following trust mortgages:

On the *Branch Line,* a $1,200,000 mortgage, dated June 2, 1862, and covering also the 6-section land grant; and a $2,800,000 mortgage, dated October 1, 1865, covering also the entire 10-section land grant.   On the *Main Line,* a $1,500,000 mortgage dated March 1, 1864, and covering the first 150 miles of the railroad but not the land grant.   A $3,000,000 mortgage, also dated March 1, 1864, and covering the first 150 miles of road and the 6-section land grant appertaining thereto, which mortgage was by its terms made subordinate to the lien of the contemporaneous $1,500,000 mortgage.   A $6,-000,000 mortgage dated July 1, 1868, covering the entire Main Line of railroad, the additional 4-section grant appertaining to the first 150 miles, and the entire 10-section grant appertaining to the remaining 57 miles of the line.   The bonds secured by the $1,500,000 mortgage (and which had never been negotiated) were, pursuant to the terms of the $6,000,000 mortgage, turned over to and held by the trustees of that mortgage, as additional security for the bonds secured by that mortgage.

The bonds of these various issues were all negotiated in Holland. In 1873, the company having stopped payment of interest on its bonds, a committee was chosen by the Dutch bondholders to protect their common interests, and a very large majority of the bondholders placed their bonds in the hands of this committee. The committee appointed Messrs. J. S. Kennedy & Co. their agents in the United States, who at once caused suits to be instituted in the proper state court in Minnesota, to foreclose the mortgages and obtain a receiver of the property. In 1876, Mr. J. S. Kennedy was appointed a trustee in each of the mortgages, in place of trustees who had resigned, and from that time the trustees of the $1,200,000 and $3,000,000 mortgages were Edmund Rice and Horace Thompson of St. Paul, Minnesota, and John S. Kennedy of New York, and of the $2,800,000 and $6,000,000 mortgages, the trustees were Messrs. Thompson and Kennedy.

In September, 1876, the trustees, under powers in the mortgages, took possession of the Main and Branch Lines, and operated them from that time until they were delivered to the purchasers under the foreclosure decrees.

On March 13, 1878, Messrs. George Stephen, Donald A. Smith, N. W. Kittson, and James J. Hill, purchased nearly all the bonds held by the Dutch committee. By the terms of the agreement of purchase, Mr. Kennedy and his partner, Mr. Barnes, were to retain possession of the bonds, as trustees, until the purchase price should be fully paid.

From the beginning the foreclosure suits had been stoutly defended by the company, and it was not until March, 1879, that decrees of foreclosure and for the sale of the property were obtained.

On May 7, 1879, the property covered by the $2,800,000 mortgage was sold under the foreclosure decree, and purchased by Mr. Barnes for the benefit of Messrs. Smith, Stephen, Kittson, and Hill, who, on May 23, 1879, organized the St. Paul, Minneapolis & Manitoba Railway Company, which also became the purchaser of all the property covered by the $1,200,000, the $3,000,000 and the $6,000,000 mortgages, and sold in May and June, 1879, under the decrees in the suits to foreclose those mortgages.

After the entry of the decree in the suit to foreclose the $3,000,000 mortgage, one Sahlgaard and others, residents of St. Paul, made a joint purchase of bonds secured by that mortgage to the amount of $11,000, intending to sell them for use in paying for lands; but as the decree

for sale of the property had been entered, no lands could then be sold at private sale, or except as provided in the decree, and the trustees therefore declined to receive the bonds in payment for land. Sahlgaard thereupon, and after the decretal sale, applied to the court for leave to be made a party to the $3,000,000 foreclosure suit, and to oppose the confirmation of the sale, charging in his affidavit that the sale under the decree in the $3,000,000 foreclosure suit was fraudulent; that the property was worth much more than the sum bid for it by the St. Paul, Minneapolis & Manitoba Railway Company, and that the trustees fraudulently refused to bid in the property for all the bondholders. This application was heard before *Simons*, J., who held that the mortgaged property had been properly sold in one parcel; that the purchase of the bonds by Messrs. Smith, Stephen, Kittson and Hill was a perfectly legitimate transaction, and that there was no ground for the charges of misconduct against the trustees. Sahlgaard's petition was accordingly dismissed, and the sale was duly confirmed, as were the sales under the decrees in the other suits.

Afterwards and in June, 1879, Sahlgaard and his associates caused a suit to be brought in the United States circuit court for Minnesota, against the trustees, the St. Paul, Minneapolis & Manitoba Railway Company, and others, to set aside the sale and order for confirmation in the $3,000,000 foreclosure suit.

Although the bonds of Sahlgaard and his associates were owned by them jointly, the suit was brought in the name of Sahlgaard alone, and in his bill of complaint he alleged that he was the owner of the bonds. This was done for the reason (as testified to by Mr. Sahlgaard when examined by the defendants) that he was not a citizen of the United States, and to give the federal court a jurisdiction it could not have if all the joint owners of the bonds had been named as plaintiffs.

In this bill of complaint Mr. Sahlgaard charged that Mr. Kennedy was secretly interested in the purchase of the bonds from the Dutch committee, in the purchase of the mortgaged property at the decretal sales, and in the St. Paul, Minneapolis & Manitoba Railway Company, and that at his instance, and under his influence, his co-trustees suffered the foreclosure suits and the management of the property to be controlled by Messrs. Smith, Stephen, Kittson, and Hill, and that the decrees were so framed as to allow those gentlemen to obtain the property at a nominal price as compared with its real value, and that, to accomplish this end, the property was fraudulently

sold in one lot instead of in parcels, and for a price much less than its value, and that the trustees fraudulently refused to buy in the property at the sale for the benefit of all the bondholders.

Having begun this suit, Sahlgaard, on behalf of himself and associates, went to Holland, to get control of other bonds of the $3,000,-000 issue, and to arrange for bringing like suits in the name of Dutch holders of bonds of the other issues, his purpose being (as he testified) "to help the poor bondholders over there—and benefit ourselves." Arriving in Holland, he caused his bill of complaint to be translated, printed, and widely circulated as a truthful statement of the facts regarding the foreclosures and sales. He supplemented this with a written opinion from counsel at St. Paul, (also translated into Dutch and widely circulated,) promising a speedy and profitable outcome of the pending suit, and such others as should be brought to set aside the other sales.

Mr. Sahlgaard at first desired to arrange with the Dutch bondholders that they should furnish money to pay their *pro rata* share of the expenses of the pending suit and such others as should be brought, and in case of success should receive 25 per cent. of the profits, the other 75 per cent. to go to himself and his associates. But the bondholders had not sufficient confidence in him or his suits to advance any money, and he then offered the bondholders their choice of two schemes, by one of which they were to allow Sahlgaard to use their bonds in his suits, and he was to advance to them at once the amount of the dividend in each case to which they would be, in any event, entitled under the decree, and allow them 25 per cent. of the net profits realized in the suits, (over and above the amount of the dividends and after deducting all expenses,) Sahlgaard and associates taking the other 75 per cent. By the other scheme Sahlgaard was to be allowed to use their bonds in his suits, but was not to make any advance to the bondholders, who would receive in each case, if the suit did not succeed, the dividend in the foreclosure suit, and if the suit did succeed, they would receive 50 per cent. of the profits over the amount of the dividend and after deducting expenses.

On Mr. Sahlgaard's return from Holland he caused suits to be instituted to set aside the decree, sale, and confirmation in the $6,000,000 and the $2,800,000 foreclosure suits. Both suits were brought in the United States circuit court for Minnesota. In one of them B. H. Stricker, and in the other A. Messchaert, was the nominal plaintiff, but the suits were controlled by Sahlgaard and his associates, who were to advance the expenses, make no charge unless

successful, and divide the net profits with the Dutch bondholders under the schemes above mentioned.

The defendants answered the bills in each suit, and a large amount of testimony was taken. The three suits were argued together at the June term, 1882, of the United States circuit court at St. Paul, before *Treat* and *Nelson*, JJ. The court dismissed the bills in each case, holding (1) That Sahlgaard's suit was wrongfully brought. (2) That the Stricker and Messchaert suits were speculative, and tainted with champerty. (3) That there was no fraud in any of the proceedings of Mr. Kennedy or the other trustees, nor in any of the acts by which Messrs. Stephen, Smith, Kittson, and Hill acquired their bonds and the mortgaged property. (4) That the proceedings in the foreclosure suits, including the decrees, sales, and confirmations, were valid, and the bondholders have no claims on any of the property.

Similar unsuccessful attempts by Sahlgaard and his associates to set aside the decree and sale of other portions of the line of the Manitoba Company (viz. the Extension Line of the St. Paul & Pacific Railroad Company, sold under foreclosure of a $15,000,000 mortgage, on June 14, 1879) were made and defeated in the cases of *Kropholler* v. *St. Paul, Minneapolis & Manitoba Ry. Co.* 1 McCrary, 299; S. C. 2 FED. REP. 302, (opinion by *Nelson*, J.;) *Wetmore* v. *St. Paul & Pacific R. Co.* 5 Dill. 531; S. C. 1 McCrary, 466; 3 FED. REP. 177, (opinion by Mr. Justice Miller;) and in the case of *Wilton* v. *St. Paul, Minneapolis & Manitoba Ry. Co.* (opinion by *Nelson*, J.,) not reported.

*Gilman & Clough*, for plaintiff.

*R. B. Galusha, Geo. B. Young*, and *Geo. L. & C. E. Otis*, for defendants.

TREAT, D. J. These three cases have been heard at the same time, by agreement of counsel, because a large portion of the evidence is common to each. Many of the questions involved have been before this court in some form or another, especially in the *Wetmore Case*, 5 Dill. 531, so that, practically, little remains for present decision except the force of the evidence submitted on the issues joined. It is not purposed to go into a statement of the cases at length, nor to analyze the evidence, review the authorities cited, or state specifically what has been authoritatively decided heretofore in the progress of this litigation. The record and all matters pertaining to the progress and ultimate decision of these cases will unquestionably undergo review by the supreme court of the United States, so that if any errors are now or have been heretofore committed, the losing party will have

ample redress. As to the *Sahlgaard Case*, there are two questions not involved in the other suits. The evidence discloses that he is not the sole owner of the bonds on which his suit is based, and that if his co-owners had been made co-plaintiffs, as they should have been, this court would have had no jurisdiction. It is urged that as the bonds are payable to bearer, and he happens to have the manual possession, therefore he has a right in equity to institute and pursue this litigation without disclosing that he is only one of many joint owners, and despite his own testimony that others than himself are such joint owners. It must be borne in mind that this is a suit in equity in which the real parties in interest must appear, especially as they are seeking to invalidate judical decrees in another forum, and to go behind those decrees to the extent, at least, of charging a trust upon the defendant railroad to the extent of bonds held by plaintiff, as if by a lien therefor. While it may be that the holder of negotiable securities can at law maintain a suit in his own name, excluding equities under given circumstances, yet when joint parties seek to upset judicial decrees, charge trusts, and fasten supposed liens in consequence of joint interests, all of them should be before the court, in order that it may be known to what extent and in whose favor a decree may be had. If the bonds in question are to be decreed a lien on the property of the defendant, it must be done for the benefit of the owners of the bonds—for those who have an equitable right thereto, and who are to be bound by the result of the litigation. If a decree should be given against this plaintiff, and he immediately thereafter shifts the manual possession to one of his co-owners, can the latter institute a new suit and avoid a plea.of *res adjudicata?* The rule is deemed clear and explicit that this plaintiff cannot maintain a suit of this nature in his own name, he being only one of several joint owners of the bonds in question, those holding a majority interest being citizens of this state. On that ground alone, if there were no others, his suit would have to be dismissed.

There is a second question, upon which it is not deemed necessary to give a definite opinion, viz., whether his appearance in the state court, under the circumstances in evidence, does not conclude him. He appeared there, requesting to be admitted a party, on the ground that the trustees of the bondholders were not faithful to their trust. Having sought the interposition of that court, and that court having passed on his demand adversely, and he having chosen to abide thereby, to what extent can he reopen that judgment, except possibly for actual fraud since discovered? If, in a direct proceeding to inval-

idate the decree of the state court, he can show that it was obtained by actual fraud, he has a right to be heard; but it might be that if full opportunity had been had to pursue his supposed rights before that court for whose aid he had applied, with a full knowledge of all the facts now presented, he would be held estopped. It is not necessary, however, to decide that point. It must suffice to refer to the many cases in which it is intimated that courts should judiciously refrain from interfering with the decrees of other courts, except when such interference or impeachment is plainly necessary.

There is a common ground of complaint in all of these cases, on which, independent of technical considerations, they would necessarily rest. It is charged that the decrees and decretal orders in the state court were fraudulent. This court has read with scrupulous care all the evidence before it, in the light of the undisputed rule that fraud must be proved and cannot be presumed,—that is, actual fraud. There were many suspicious circumstances which called for explanation, and which, as Justice Miller says, are not to be viewed in the light of after events for a correct interpretation. All the facts and circumstances must be considered as they existed with respect to the property involved at the time action was had with regard thereto. It is not uncommon that men embark in enterprises which promise great gain, and are ruined thereby; and, on the other hand, men invest in doubtful enterprises, and win eminent success. The latter seems to have been the case in hand. The foreclosure suits had been long pending. All parties concerned knew that, without relief from some unknown quarter, decrees and sales would inevitably follow. The bondholders, represented by their trustees, were urging such decrees and sales. In the mean time the depreciated bonds were on the market, subject to the outcome of pending litigation. The majority resolved on the course deemed best for the interests of all, and urged all to join them. The known end was reached, ample opportunity for rescue having been given to the minority bondholders to appear, if they chose to incur the needed responsibility for averting the catastrophe. They did not choose to move in the matter, although invited so to do. Where, then, is the actual fraud? None appears. Mere inadequacy of consideration at a judicial sale does not establish a fraud.

But it is further urged that a constructive fraud exists, and on the solution of that question, if none other applies, these suits must hinge. Every authority cited, and many others, have been carefully examined in order to reach a right conclusion. Most of the cases have

turned upon the action of a trustee in buying for himself the prop‹ erty of his beneficiary, or speculating upon his trust, in some way, for his own benefit, to the detriment of those whose interests were entrusted to him for their protection. He cannot be agent of both buyer and seller, and favor one to the injury of the other, his double relationship being concealed. It is not necessary to refer to cases of attorney and client, guardian and ward, etc. Kennedy & Co. were the representatives of the Amsterdam committee in an agreement pronounced by Justice Miller to be perfectly legitimate. As such representatives, they were bound to see that the syndicate complied with the contract made. They held the securities in their hands for the enforcement of the contract. That could not be effected until after decretal sales and confirmations. Those decretal sales were to be for the benefit of all bondholders, and every bondholder and stranger was invited to purchase. Full publicity was given. When Mr. Kennedy became a trustee by appointment, what was his duty to the bondholders? Evidently, to enforce their rights through fore-closure. All other means had failed. His duties as representative of the Amsterdam committee, instead of being repugnant to his duties as trustee, were in entire accord. If, however, he, in actual fraud of the rights of the minority bondholders, entered into a scheme with the so-called syndicate to sacrifice the property, so that the syndi-cate should acquire the same in a way to defraud the minority, then not a constructive but an actual fraud existed. As already stated, no actual fraud is shown, and no constructive fraud appears.

The result is decisive of all three of the cases. Yet it is not improper to remark that courts of equity scan with great distrust all champertous suits. It is clear that the Stricker and Messchaert suits are tainted with champerty. It does not appear that they were the owners of any bonds until after the decretal sales and confirmations. Hence the strong *dicta* of the United States supreme court in recent cases are applicable. If the bonds were bought after such judicial action, they had no value except as judicially established. Their purchasers did not acquire an assignment of a supposed right of action to impeach such judicial proceedings. It would be inconsistent, as suggested by the United States supreme court, with all rules of equity concern-ing property interests of the nature involved, if, after judicial sales, any one not at the time interested in the controversy could, by the purchase of one or more bonds, be permitted to assail such decrees. There may be thousands of such bonds outstanding, and one or more speculators in lawsuits could, if a different rule obtained, stir up litiga-

tion indefinitely. If he bought bonds after the judicial decrees, he bought subject thereto.

As to the sale in gross, the courts have decided that such is the legal and proper mode in this class of cases. This court has not failed to notice the difference between the decrees entered in the state court and those usually entered in like case as in this court under the $15,000,000 mortgage. Hence the evidence was closely scrutinized in that regard. Why a clause was not inserted in the decrees permitting the minority bondholders to come in after purchase within a limited time, on equal terms with purchasing bondholders, is not disclosed. There may have been adequate reasons to the contrary, and it is not for this court to revise those decrees in that respect, or as to any other of their details.

The result is that each of these three cases must be dismissed, with costs, and a decree will be entered accordingly.